[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This custodial dispute, centered about a series of allegations of child sexual abuse by the defendant mother against the plaintiff father, arises within a dissolution action. The plaintiff, aged 31, and the defendant, aged 33, married in Roanoke, Virginia, on September 22, 1984. It was the first marriage for each. Plaintiff has been a resident of this state for at least the twelve months next preceding the date of the decree.
Two minor children have been born of this marriage: Brittany Butler, born January 9, 1988, aged 4; Shane Butler, born August 31, 1989, aged 2. CT Page 1467
No other minor children have been born to the wife since the date of the marriage. No individual or agency is presently responsible by virtue of judicial award for the custody or support of any child. Neither is the recipient of public assistance from the State of Connecticut or any of its governmental subdivisions.
Attorney Jean Ferlazzo represented plaintiff father.
Attorney Karen Reynolds represented defendant mother.
Attorney Valerie Fischel represented the minor children.
Barbara S. Bunk, Ph.D., was the court appointed evaluator.
Nancy Van Steeden was the Family Relations Counselor.
FINDINGS RE: SEXUAL ABUSE
Allegations of sexual abuse during a contested dissolution of marriage are of grave concern. They have substantial impact upon community services, the courts and the families involved. The claims color the existence of the principals, adults as well as minors, in ways that reverberate throughout their lives.
Investigators, evaluators and the courts respond with care and caution, fearful of erring and placing the vulnerable child in jeopardy. The normal principles of guilt in our constitutional society are often swept aside in an eagerness to protect the young. The claimed behavior is so abhorrent, harsh preliminary judgments are often made and incorporated into recommendations and orders, all in the name of safeguarding the defenseless. The accused is at great parental risk. Evidence of wrongdoing results in severe orders. Often, even in the absence of evidence, the accused is treated harshly. Accusations so often change the balance of power in custodial disputes, that they become lethal weapons.
Here, the judicial system was offered the opportunity to review the circumstances and to observe the accuser, the accused and all the witnesses and evidence offered by each of them. It was offered the testimony of the Virginia Protective Services investigator who investigated the first allegation and supervised many hours of plaintiff's visits with his children. The investigator was present for many interactions between plaintiff and his family and defendant and her family. The court was offered the testimony of the psychological evaluator appointed by the Connecticut court and the Family Relations Counselor. The CT Page 1468 court explored the exhibits entered into evidence by each of the parties, applied the applicable law, and did it all as thoroughly as the parties themselves wished. This trial consumed six days of testimony.
CHARACTER WITNESSES
The testimony of Joan Esslinger, Selma Goldwitz, Kay Tahari Carol Buttner, Ruth Becker and Justine Butler was of limited use to the court. Each tended to be character witnesses for the plaintiff, fulfilling their responsibility by speaking well of their sponsor, Scott Butler.
Justine Butler, plaintiff's mother, was cross-examined sharply by defendant. Though no points were scored, it is clear that Justine Butler, Grandma Jus, is someone for whom Stephanie Butler has little affection.
FAMILY RELATIONS COUNSELOR
Family Relations Counselor Nancy Van Steeden testified: "the evidence was so inconclusive" when she was appointed, "there didn't seem to be any way to go but to await the psychological examinations." "I had little confidence in my recommendations (which adopted the parties' visitation agreements)." "They were truly interim recommendations."
PLAINTIFF'S PSYCHIATRIST
Donald Bell, M.D., was plaintiff father's psychiatrist.
A man with impressive credentials and with confidence inspiring demeanor on both direct and cross examination, he never-the-less had a therapeutic relationship only with Scott Butler and had never met with either Stephanie Butler or the children. Under those circumstances, the court is unable to accept Dr. Bell's reassurances that Scott had not abused Brittany, but does credit Scott for his choice of therapist.
PROTECTIVE SERVICES INVESTIGATOR
FIRST ALLEGATION OF SEXUAL ABUSE
Tom Kerfoot, Protective Services investigator for the Roanoke County (Virginia) Department of Social Services, testified at length with regard to the first issue of sexual abuse, alleged to have occurred in January 1990. He was a valuable and credible witness who investigated that first allegation together with Detective L.G. Hudson, beginning on February 5, 1990. CT Page 1469
Mr. Kerfoot testified Detective Hudson knew the defendant mother before this incident. The detective vouched for her character and said she was a good person. Because of Detective Hudson's confidence in the defendant mother, the detective was instrumental in the first tentative conclusion of "reason to suspect" abuse, Mr. Kerfoot testified.
Kerfoot and Hudson constructed a bathroom scene with dolls so Brittany, who was just two years old and not yet verbal, could show them what happened. It didn't work. "She may have said `Daddy hurt me', but I'm not sure she said that", testified Mr. Kerfoot. In his letter to Dr. Bunk (Childrens' Exhibit IV), Mr. Kerfoot advised: "That initial determination was one that was made on a marginal basis with the primary focus being the protection of. . .Brittany." During this hearing, he spoke of it as "a very marginal case".
Based upon the early finding, supervised visitations were ordered by the Virginia court. Mr. Kerfoot became the supervisor. The first visitation was held in Mr. Kerfoot's small office as were a number of succeeding visits. He continued to be present during subsequent visits by Scott Butler and his family, culminating in Kerfoot's supervision of a full weekend of visitation in June.
After his close observation of the alleged victim in the continued presence of the alleged victimizer, Tom Kerfoot concluded and testified that "I do not think any sexual abuse occurred." There was only the mother's accusation, one possible and ambiguous comment by the child ("`Daddy hurt me' could mean anything", said Kerfoot), no physical evidence whatsoever and the fact that Detective Hudson knew the mother and vouched for her, he reported.
After a conference review, in which both Kerfoot and Hudson participated, Protective Services reversed their initial "reason to suspect" finding. They entered a finding of "unfounded", countersigned by Mr. Kerfoot's supervisor.
Mr. Kerfoot had additional areas of comment.
He found Sally Noonkester's evaluation to be invalid. Noonkester had been hired by the defendant mother to evaluate mother's abuse allegation. She found abuse. "The questions she (Noonkester) presented to the child were leading and close ended — a `how not to' interview," he said. "They have a huge tendency to suggest answers". Mr. Kerfoot also believed the Noonkester interview was capable of suggesting future answers by Brittany as well and may have been a training experience for the child. CT Page 1470
He reported his experience with Stephanie Butler's father, who remonstrated with him, pointed his finger at him, accused him of having blinders on and had to be asked to leave. Mr. Kerfoot reported he had a similar experience with him on the telephone.
Finally, Mr. Kerfoot recounted an experience when the defendant mother counted the diapers and claimed plaintiff father had not changed Brittany's diapers often enough during his visit. Mr. Kerfoot supervised that visitation. "I know there were more diaper changes than the one she claimed," he testified.
HENRICO COUNTY DEPARTMENT OF SOCIAL SERVICES
SECOND ALLEGATION OF SEXUAL ABUSE
The second instance of sexual abuse was alleged to have occurred on April 6, 1991, a date that was less than ten days after Judge Bassick entered a Connecticut order for plaintiff father to have access to the children on alternate weekends. At the same time, Judge Bassick scheduled a May 1, 1991 hearing which the defendant mother and the children were directed to attend.
After investigation, the Henrico Department of Social Services (see Plaintiff's Exhibit D) found no abuse had taken place.
Henrico reported that they based their finding on a number of considerations:
 The only people who heard Brittany's statement were her mother and two doctors who spoke to Brittany after leaving her alone with her mother in the middle of the interview, allowing for a coached response by the child. (The second doctor, Dr. Kraft, actually spoke to Brittany two days after Brittany's interview with Dr. Noble. — JLS)
 Mr. Butler's father was with him and Brittany throughout the visit.
 Brittany showed absolutely no fear of her father on the day following the alleged incident and wanted to go with him.
 The medical examination of Brittany found no physical evidence of sexual abuse.
 When interviewed by Mr. Dobbins and the detective, Brittany was unable to identify the color red. (Mother reported Brittany spoke of a red balloon. — JLS) CT Page 1471
 This allegation was an effort by the mother to get the matter in Henrico's court and away from Connecticut.
COURT APPOINTED EVALUATOR
Barbara Bunk, Ph.D., was appointed by the court to evaluate the abuse allegations. A clinical psychologist, she specializes in dealing with children and families of abuse. She was a particularly credible and helpful witness.
She discounted Sally Noonkester's technique for eliciting information, being of the opinion that she did not employ good, effective techniques for producing unbiased information. See Defendant's Exhibit 4, where Noonkester presents her dialogue with Brittany. Dr. Bunk testified "It was certainly possible that Brittany learned from this (Noonkester) interview", mirroring the concerns of Mr. Kerfoot.
Dr. Bunk testified that "When there's a number of interviews, they could teach a child to interpret behavior as child abuse." Defendant mother testified she questioned Brittany when she returned from visits with her father — to see "if anyone touched her, anyone hurt her in a way that made her feel uncomfortable."
After calculating the number of times this young child has already been interviewed, Dr. Bunk found eleven different interviewers and examiners in addition to herself: Brittany's mother, the pediatrician, Kerfoot and Detective Hudson, Noonkester, Stephanie's mother, Detective Muncie and social worker Dobbins, Doctors Noble and Kraft and Quick.
Dr. Bunk's response to the parade of interviewers was her concern that Brittany had been educated to such an extent that it was now impossible for Brittany to accurately communicate about the sexual abuse issue. Not included in the totality of interviews and interviewers were Stephanie's aunt, Pat Smith, and Stephanie's repeated inquiries following each visit of her husband, Scott Butler. Credible testimony indicates there were twenty-four visits by Scott Butler in Virginia.
Dr. Bunk also testified to the natural inclination of Brittany, when so many interviews had taken place, to comply with the repeated requests to relate what bad things her father had done to her.
There was credible evidence offered that during a June 1991 visit, Stephanie Butler's aunt, Pat Smith, yelled repeatedly at Scott Butler, in the presence of Brittany and Stephanie Butler. She yelled that he was a sex abuser and that he should stay away CT Page 1472 from Brittany. Dr. Bunk testified such behavior in the presence of a parent would cause her concern about that parent's parenting. Dr. Bunk was also concerned that Brittany would interpret that behavior to suggest that in order to be liked she would have to say her Daddy was a sex abuser.
Doctor Bunk testified that, when evaluating the allegations of sexual abuse, she looked at the timing of accusations. When they arise just prior to a divorce action it causes her to question their motivation. If an accusation occurs within weeks after a court hearing, she would look at it with care. Both occurred in this case.
Dr. Bunk testified that if a second accusation occurred less than ten days after a court hearing awarding visitation to the accused, she would be concerned. The doctor was not aware that had happened in this case.
Stephanie Butler did not report her drug use to Dr. Bunk, although she did discuss Scott's drug use with her.
Dr. Bunk said "If Stephanie (the defendant mother) lies in this courtroom, it would cause me concern."
Dr. Bunk listed some symptoms of sexual abuse, which included public masturbation.
Dr. Bunk testified that if the allegations of sexual abuse were found to be false, and done intentionally, she would support a change of custody and residence.
THIRD ALLEGATION OF SEXUAL ABUSE
The third instance of sexual abuse was alleged to have occurred in October 1991.
Dr. Barbara Bunk reported about it as follows:
Plaintiff mother had brought Brittany to see Dr. Gail Quick, a psychologist, in Richmond, Virginia, once in May 1991 and once in June 1991. During the June meeting, the focus was on the April 6, 1991 allegation.
On October 21, 1991, Dr. Quick saw Brittany again, at Defendant mother's urgent request. Brittany appeared to be extremely anxious. The meeting was inconclusive. Two days later, Brittany returned, telling Dr. Quick that she "promised Mom" she would talk.
Brittany first said Daddy hurt her, then said Grandma Jus CT Page 1473 (Justine Butler) had hurt her. Then she said she hadn't, and waivered back and forth about it for the remainder of the session. Brittany described what Dr. Quick interpreted as appropriate caretaking. Dr. Quick did not think any abuse had taken place.
Dr. Quick also thought perhaps plaintiff mother's concern about sexual abuse had been inadvertently communicated to Brittany by questioning after visits with her father, and that Brittany was now hypersensitive to touch and normal caregiving.
It should be noted that the same Dr. Quick found the June 25, 1991 discussion with Brittany and defendant mother about the April 6, 1991 allegation to be "believable", contrary to the conclusion of the Henrico County investigative team.
PLAINTIFF'S FATHER
Clarence Butler, father of the plaintiff, and constant supervisor for Scott Butler's Virginia visitations, testified. The senior Mr. Butler was a dignified and credible witness. He spoke with great warmth of his early relationship with his daughter-in-law, Stephanie. Stephanie confirmed the loving relationship they both enjoyed before the allegations of sexual abuse arose.
Clarence Butler discussed the April 6, 1991 visitation, which he supervised, which resulted in the second allegation of sexual abuse. Defendant mother reported Brittany said her Daddy touched her and hurt her. Under oath, this credible man, testified that his son never left his sight and had no opportunity to abuse Brittany. "I was never asleep." He testified there was no question in his mind that nothing transpired. He acknowledged that his testimony, if believed, meant that either his granddaughter did not tell the truth or that her statement was misrepresented.
Clarence Butler's testimony that no sexual abuse occurred was sustained by Virginia authorities.
PLAINTIFF FATHER and DEFENDANT MOTHER
Plaintiff father was the more credible of the two witnesses.
He spoke thoughtfully and faced his errors in judgment with a frank acceptance. He admitted to his pre-marital and early marriage drug use, the swastika incident, his lack of money management skills, his employment focus and other sources of marital friction. When he spoke of the injustices he felt had been done to him, he spoke in moderate tones, without an edge of CT Page 1474 bitterness. His physical and verbal behavior generated credibility.
In spite of the sixteen or more hours of travel required to see his children, sometimes for as short a visit as three hours, plaintiff father maintained his contact. In spite of the humiliation of some visits being video taped while limited to Mr. Kerfoot's cramped office, plaintiff father maintained his contact. In spite of the disgrace of having his every moment of access to his own children monitored, he maintained his contact. It is ironic that the very process of supervision ultimately resulted in his exoneration by Mr. Kerfoot.
Defendant mother was not a credible witness. She lied, invented, manipulated and showed a repeated willingness to ignore court orders and impose her own custodial rules. She limited plaintiff father's access to Brittany arbitrarily and repeatedly.
She infected the process of information gathering by exposing Brittany to a succession of interviews and examinations. She questioned Brittany after each visitation by her father.
She attended or participated in many of the professional interviews, tainting them.
She denied sleeping at Jimmy Roche's, her gentleman friend's home, with Brittany and Shane present. She later changed her testimony.
She denied Jimmy Roche slept at her home with Brittany and Shane present. She later changed her testimony.
She claimed she ceased her use of cocaine when she became pregnant with Brittany. She later changed her testimony to admit her use of cocaine while nursing Brittany.
She testified Brittany was upset the night of April 6, 1991, so upset Dr. Noble could not examine her when defendant mother brought her in, pursuant to the second allegation of sexual abuse. Dr. Noble's medical record, Children's Exhibit 6, reads: ". . .child did not appear anxious or agitated. . .when asked if Dad hurt her Brittany said no." Statements confirming mother's allegations were made by Brittany only after Dr. Noble left the room, leaving Brittany alone with the accusing mother. Dr. Noble concluded nothing happened to Brittany on April 6, 1991.
Defendant mother testified she was not present on April 7, 1991, when Detective Muncie and social worker Doug Dobbins interviewed Brittany for an hour. She later changed her testimony to admit she was present throughout the interview. Defendant CT Page 1475 mother's friend, Jimmy Roche, known to the children as "Daddy Jimmy", appears likely to have also been present, further infecting the process.
Defendant mother did not tell Dr. Bunk of her use of cocaine while she was nursing Brittany.
Defendant mother did not tell Dr. Bunk of the presence of "Daddy Jimmy" in the children's lives.
On the fifth day of trial, February 3, 1992, Defendant testified that she had observed Brittany masturbating after April 6th. Earlier in the trial, Dr. Bunk had made reference to masturbation as a symptom of sexual abuse. None of the earlier evidence, none of the earlier reports, nor the defendant's own earlier testimony — prior to Dr. Bunk's testimony — made any mention of masturbation. This late claim was not credible.
A court in a contested custody dispute centered about a claim of sexual abuse must examine the quality of the examinations and evaluations with care. It must measure each examination and evaluation against standards that assure an untainted process. In spite of a series of allegations and examinations and result focused questioning, no physical evidence has been found. Each alleged incident of sexual abuse has been authoritatively rejected.
The pattern of the allegations, the tainting of the child's thought process and the conclusions of no abuse by thoughtful and experienced evaluators convinces this court that defendant mother undertook a campaign to destroy her husband's relationship with his children. Her behavior has been so deliberate, so methodical and so willful, she gives every indication of having been malicious, although no specific evidence of malice has been found.
In her single minded pursuit of her husband, she has repeatedly ignored court orders and usurped judicial prerogatives.
Following the first allegation made on February 5, 1990, plaintiff father had no access to the children until April 27, 1990, when the Virginia court allowed plaintiff father one three hour supervised visit a month. As he was leaving for that first supervised visit, defendant mother called and canceled it. A new date was arranged.
On July 10, 1990, plaintiff father arrived for a supervised visit, accompanied by his parents. Defendant mother became angered that the personal property he brought to her included the CT Page 1476 wrong crib, and refused the visitation. The visit did not take place until the next day.
On August 10, 1990, defendant mother advised the Roanoke court, which was poised to consider plaintiff father's visitation, and was about to hear Mr. Kerfoot's conclusion that no abuse had occurred, that she would be moving to Richmond. Richmond is beyond the jurisdiction of the Roanoke court. Roanoke thereupon transfered the file to Richmond for that court's determination of future visitation, leaving plaintiff father with still no visitation orders.
Although defendant testified she was aware in July that she would be leaving Roanoke, she did not advise plaintiff father until August 10th, the day he arrived in Roanoke for the court hearing.
When she moved to Richmond, defendant mother did not give plaintiff father the children's address or telephone number. In November 1990, Judge Bassick of the Connecticut Superior Court found Connecticut to be the home state of the children. After conferring with the judge in Henrico County (Richmond, Virginia), Judge Bassick found that Connecticut was the most convenient forum for resolving all the issues. Visitation orders were not yet entered. A Connecticut Family Relations report was ordered.
Defendant mother did not allow plaintiff father a Christmas visit during 1990. Nor was he, or his family, permitted to talk to the children on the telephone during the holiday season.
The parties negotiated visitation. Mother allowed no overnight visitation and insisted all visits be supervised. She further insisted that father return the children to her from noon to 2 pm during his visits so she could be assured the children had naps.
On March 28, 1991, Judge Bassick of the Connecticut Superior Court ordered telephone access and alternate weekend visitations, supervised by plaintiff's father, Clarence Butler. He further ordered that defendant mother provide plaintiff father with the children's address and telephone number and that she and the children return to Connecticut on May first for further hearings.
Plaintiff father's first visit under the jurisdiction of the Connecticut court was April 6, 1991. Plaintiff drove down with his father and spent Saturday with the children. He returned on Sunday morning for the balance of the weekend visitation, was turned away at the door and asked to come back later. When he returned, he was met by Detective Muncie and Social Worker CT Page 1477 Dobbins and was advised that a second allegation of sexual abuse had been made. After investigation, the allegation was later held to be unfounded by Virginia authorities.
Defendant mother refused to allow the court ordered visitation of April 20 and 21, 1991 to take place.
In May of 1991, the parties returned to the Connecticut courts and had two days of hearings before Judge Hauser, who ordered visitation on alternate weekends, despite the April 6, 1991 allegation.
During June visitation, Brittany did not arrive until 2pm for the 9am to 5pm visit.
Shane's birthday fell during plaintiff's August 31, 1991 visit. Defendant refused plaintiff his scheduled access. He'd have to come the next weekend.
On October 25, 1991, a third allegation of sexual abuse was made. It was less than a month after the Henrico Department of Social Services found no abuse with regard to the second allegation.
Plaintiff father was refused visitation by defendant mother during November 1991.
In December of 1991, Judge Karazin of the Connecticut Superior Court found defendant mother to be in contempt of the court's visitation orders. In addition to reinstating the alternate weekend visits, Judge Karazin granted plaintiff father Christmas week in Connecticut with the children, supervised by his father, Clarence Butler. That visit took place without incident.
When defendant mother, pursuant to the orders of the Connecticut Superior Court, brought Brittany and Shane to see Dr. Bunk, defendant understood that her husband was to have visitation during that Connecticut stay. She refused father access, testifying she had been advised it would be better not to allow Brittany contact with her father while the child was speaking to Dr. Bunk.
In view of the behaviors of both parents, and their families, it is not in the best interests of Brittany and Shane to remain in the custody of their mother, Stephanie. The defendant's role in the series of allegations, her rejection of the conclusions of no sexual abuse, her interference with the father's scheduled access to the children, her repetitive probing of Brittany's experience with her father and the angry accusative atmosphere CT Page 1478 that surrounded plaintiff father's visits, were all damaging to Shane as well as to Brittany.
It is not in the childrens' best interests to be raised in such a milieu. This, in spite of defendant mother's past role as the primary caretaker of Brittany and Shane. Her pattern of behavior is abusive of the children.
Repetitive focusing on allegations of sexual abuse inflicts damage upon the alleged victim as well as upon the accused.
Plaintiff father is more likely to encourage access of the defendant mother to the minor children of the marriage.
Plaintiff father, his family and friends, offer a less adversarial atmosphere in which to raise the children, one less likely to engender negative attitudes towards defendant mother.
Plaintiff father has demonstrated a deep love for his children, one not easily deterred by the inconvenience of protracted travel in the face of limited access and the embarrassment and inconvenience of supervised visitation.
Testimony of the behavior of defendant's father and defendant's aunt, when compared with the behavior of plaintiff's parents, sister, landlord and family friends, gives the court confidence that the best interests of the children are served by their closer connection with those living in proximity to their father.
FINANCES
Plaintiff earns a net weekly income of $187. Defendant has a weekly net income of $297.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, a finding shall enter that the marriage has broken down irretrievably, a decree of dissolution shall enter and the following orders shall apply:
1. CUSTODY
a. The parties shall have joint legal custody of the minor children, Brittany and Shane.
b. Plaintiff father shall have primary physical custody of CT Page 1479 the minor children and shall have primary day-to-day responsibility and authority for their care.
c. The parties shall consult on major decisions involving the children's health, education and welfare.
d. If the parties are unable to reach an agreement, plaintiff father's decision shall be final.
2. ACCESS
Defendant mother shall have reasonable rights of access to the minor children, which shall include, but not necessarily be limited to the following:
a. Until Brittany is enrolled in kindergarten, the second week of each month including the two surrounding weekends, being a total of eight days each month.
b. When one or both of the children have entered kindergarten or elementary school, mother shall have access to the children on the second and fourth weekends of each month. If a school holiday or school vacation adjoins any weekend during a month, mother's weekend may be changed, at her option, to incorporate a vacation day or a holiday, creating a three day weekend. Such exceptions to the second and fourth weekend schedules are to be chosen by defendant, in advance, in December preceding each calendar year to enable each of the parents to organize their schedules and plan care for the children. For the year 1992, defendant's selections shall be made no later than the month of March.
c. Mother shall have the weekend that includes Mother's Day as one of her two weekends in May. Father shall have Father's Day.
3. HOLIDAYS AND VACATIONS
a. The parties shall alternate Christmas and Thanksgiving. When Thanksgiving is scheduled for Mother, it shall be a four day access, Thursday through Sunday. When Christmas is scheduled for Mother, it shall also be a four day access. Father shall establish the alternating schedule.
b. Mother shall have two weeks of access during the summer months, to be agreed upon at least two months in advance by both parties. In the absence of an agreement, Father will determine the schedule. The weeks may be consecutive, if mother so elects.
c. This court specifically empowers, and encourages, the CT Page 1480 parties to vary any portion of the Access or Holidays and Vacations schedules in any mutually agreeable manner.
d. The court would hope the parents will observe the principle that these young children are not to be transported for the convenience of the parents. Except in unusual circumstances, parents are likely to be the more appropriate travelers.
4. INFORMATION
a. Each of the parents shall keep the other informed of the whereabouts of the children, including their address and telephone number, while said children are with them.
b. Father will notify all academic and health providers of mother's name and address and of her right to their records.
5. TELEPHONE ACCESS
a. Each of the parents may telephone the children at reasonable times and for reasonable lengths of time, on alternate days when separated from the children.
b. The timing of the calls is to be coordinated with the children's schedule rather than the calling parent's schedule. If calls are made at an inconvenient time, the parent with whom the children are staying shall be responsible for suggesting a more convenient time.
c. This telephone access is not to be employed to harass, to interfere or for any adversarial purpose.
5. CHILD SUPPORT
a. Mother's net earnings of $297 a week would normally require her to pay child support of $121 a week, based upon the child support guidelines.
b. Because transportation and housing costs during mother's visits with the children, as set forth in paragraph 2 and 3, above, will be significant, the court finds a deviation criteria to exist and holds that application of the Guidelines would be inequitable and inappropriate.
c. Defendant mother shall pay defendant father child support in the amount of $50 a week beginning the Friday immediately following this decision.
6. ALIMONY CT Page 1481
Neither party shall pay alimony to the other.
7. MEDICAL INSURANCE
a. The parties shall each share the cost of medical insurance coverage for the benefit of the minor children.
b. Until a determination of which insurance shall be used is made, both parents are directed to continue maintaining their current childrens' medical insurance coverage.
c. After exchanging the insurance plans, and the costs thereof, the parents are directed to consult and choose the more appropriate coverage.
d. If an agreement is not reached within thirty days hereof, father is hereby empowered to select the coverage he deems best. Mother shall pay one-half the cost thereof.
e. The provisions of Section 46b-84(c) of the Connecticut General Statutes shall apply.
f. From this date forward, the parties shall share equally all the children's uninsured medical, dental, prescription, orthodontic, mental health care and other costs incurred for their physical and mental health.
8. TAX EXEMPTIONS FOR THE MINOR CHILDREN
a. Father shall be entitled to claim the minor child, Shane, as his tax exemption.
b. Mother shall be entitled to claim the minor child, Brittany, as her tax exemption, provided she is current with all payments and with all responsibilities called for in these orders as they may be amended from time to time.
c. Each parent will sign the documents necessary to effectuate the other's use of those tax exemptions upon presentation and request.
9. PERSONALITY
a. The parties agreed to a transfer of thirty-two items of personal property as set forth in paragraph 7 on pages 12, 13 and 14 of a document entitled Claimed Facts dated January 22, 1992. Items numbered 26 and 27 are to be shared equally. It was also agreed that a certain camcorder was to be given to father.
b. The United States Savings Bonds shall forthwith be divided CT Page 1482 equally between the parties by current cash value.
c. Each of the parties shall retain ownership of all those other items presently in their possession.
10. AUTOMOBILES
Each of the parties shall have title to the motor vehicles currently in their possession and shall hold the other harmless with regard thereto.
11. LIABILITIES
a. Father shall be responsible for those debts listed on his financial affidavit dated January 27, 1992.
b. Mother shall be responsible for those debts listed on her financial affidavit dated January 31, 1992.
12. DR. BARBARA BUNK
a. The court finds the $1500 bill submitted by Dr. Barbara Bunk to be fair and reasonable.
b. Each party is directed to pay Dr. Bunk a total of $750 at the rate of $150 a month beginning March 1, 1992 and on the first day of every month thereafter until paid in full.
13. COUNSEL FOR THE MINOR CHILD
a. Counsel for the minor child, Valerie Fischel, is awarded $9633.31 for her services.
b. Each party is directed to pay said counsel a total of $4816.65 at the rate of $200 a month beginning August 1, 1992 and the first day of every month thereafter until paid in full.
14. ATTORNEYS' FEES
Each of the parties shall be responsible for their own attorney's fees.
15. NEGOTIATIONS
a. The court recognizes that the parties may have mutual preferences that have not been revealed to the court during the trial or which the court may have otherwise inadvertently thwarted.
b. Final divorce terms established by the parties themselves CT Page 1483 are historically more comfortable for the parties to live with and abide by. Therefore the court empowers the parties to confer and to seek mutually acceptable variations of the court's orders.
c. Any such mutually negotiated modifications are to be submitted directly to the undersigned in written form, signed by all three counsel as well as the plaintiff and the defendant not later than thirty days after this judgment, without costs and without the need to establish a substantial change of circumstances.
d. Beyond that date, or before any other court, modification shall be by the traditional route and must meet all the more formal requirements.
16. APPEAL
All the foregoing orders with respect to custody and access shall stand and operate as interim orders of this court during the pendency of any appeal.
Joseph L. Steinberg, Judge